IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHELLE COLLINS,

        Plaintiff,

                                       **Civil Action 2:16-cv-517**
vs.                               **Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## OPINION AND ORDER

Plaintiff, Michelle Collins, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3)

for review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her applications for social security disability insurance benefits and supplemental security

income. This matter is before the Chief United States Magistrate Judge for disposition based

upon the parties' full consent (ECF No. 10), and for consideration on Plaintiff's Statement of

Errors ("SOE") (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 21),

and the administrative record (ECF No. 11). For the reasons that follow, the Court

**OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

In November 2010, Plaintiff filed applications for both supplemental security income and

disability insurance benefits. (R. at 322-34.) Plaintiff maintains that she became disabled on

July 7, 2010, as a result of bipolar disorder, manic depression, arthritis in her neck, back and

1

shoulders, degenerative disc disorder in her neck, fibromyalgia, and diverticulitis. (R. at 359, 364.)

After various administrative proceedings, Administrative Law Judge ("ALJ") Vincent Misenti, denied Plaintiff's applications on January 3, 2013, based on his conclusion that Plaintiff's impairments do not constitute a "disability" within the meaning of the Social Security Act. (R. at 170-80.) On March 1, 2013, Plaintiff filed a Request for Review of Hearing Decision Order. (R. at 265.) On July 19, 2016, the Appeals Council granted review and remanded the case to the ALJ. (R. at 187-88.)

On August 28, 2014, ALJ John M. Prince held a supplemental hearing. (R. at 32-62.) Plaintiff appeared and testified at the supplemental hearing, represented by counsel. (R. at 36-56.) A vocational expert also appeared and testified at the hearing. (R. at 57-61.) On September 8, 2014, ALJ Prince issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 11-24.) On October 2, 2014, Plaintiff filed a Request for Review of Hearing Decision Order. (R. at 316-21.) On April 11, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.) Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY[1]

### A.      Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she volunteers through the Job and

Family Services department for her food stamp benefits.  (R. at 37.)  She performs 36 hours per

month which she tries to accomplish in a week's time.   (R. at 38.)

Plaintiff estimated that she can walk only 50 feet without her crutches, and stand for only

5 minutes at a time.  (R. at 38.)  She also testified that she could not walk further than a block

even with her crutches.  (*Id.*)  After standing for 5 minutes she would then need to sit for 15-20

minutes to recover.  (R. at 45.)  She reported knee instability with walking.  (R. at 42.)

Plaintiff began having avascular necrosis symptoms in 2010.  (R. at 40.)  Since that time

her symptoms have gotten worse.  (*Id.*)  Her doctors have informed her that unless she breaks her

leg, they cannot do anything.  (R. at 41.)  She has a lot of pain in her left knee and there is also

some tingling and numbness.  (*Id.*)  Her leg falls asleep occasionally.  (*Id.*)  She reports

instability when she walks.  (R. at 42.)  She stumbles from time to time, but she does not report

any falls.  (*Id.*)  She has to sit down after five minutes of work when she does the dishes or cooks

supper.  (R. at 45.)  She has to sit down for fifteen or twenty minutes before she is able to stand

again.  (*Id.*)  She can sit for an hour or two before she has to change positions.  (R. at 46.)

Plaintiff does not believe she can perform a job that requires her to sit the majority of an

eight hour day because she would find it distracting.  (R. at 49.)  When she was volunteering for

RSVP, she said there was "a lot of drama," and it was hectic.  (R. at 50.)

---

[1]Although the record contains a history of treatment for numerous issues, Plaintiff's arguments
on appeal relate only to her physical condition. (*See* ECF. No. 18.)  Accordingly, the Court limits
its discussion to plaintiff's claimed physical impairments.

On a typical day, she makes sure her 16-year-old son is getting ready for school, and then she goes back to bed until noon. (R. at 50.) She is able to wash dishes, but claims she spends most of the day with her legs elevated. (R. at 50-51.)

Plaintiff further testified that she always takes her medications as prescribed. (R. at 53.) She only attended two physical therapy sessions because the therapy "didn't seem to help." (*Id.*)

When asked about a March 2012 drug screen, in which Dr. Losch refused to prescribe medication, Plaintiff responded, "I didn't know what that was all about, but there was something in my records, evidently, because every time I go somewhere to get medication they refuse me." (R. at 54.)

B.     **Vocational Expert Testimony**

Prior to the vocational expert ("VE") testifying at the administrative hearing, Plaintiff's counsel and the ALJ agreed that Plaintiff's past jobs include bartender, short order cook/deli clerk and security officer/first aid attendant, all at the light exertion, semiskilled level. (R. at 39-40.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 58-60.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her past relevant work because none of her jobs were sedentary. (R. at 57.) She could, however, perform approximately 204,000 unskilled, sedentary exertional jobs in the national economy such as an assembler, inspector, and hand bander. (R. at 59.)

The VE also testified that if the hypothetical individual had an additional limitation of lifting only five pounds, she would be able to perform some assembly jobs such as an atomizer assembler. (R. at 60.)

### III. MEDICAL RECORDS

#### A. Holzer Clinic

The first treatment note from Ann Losch, D.O., is dated February 12, 2010, for "many, many, many, many, many complaints." Plaintiff reported being in a motor vehicle accident on December 3, 2009. She was a restrained driver. She says she was driving about 20 miles per hour and ran right straight into a ditch. She was thrown forward against the seat belt, her knees rammed into the dashboard, and now has pain in her neck and both knees. Plaintiff did not go to the emergency room, but she reports the knee pain keeps her awake at night. (R. at 476.) On examination, Dr. Losch found no cyanosis, clubbing, or edema on Plaintiff's extremities. She found tenderness and spasm on posterior cervical muscles along her trapezius muscles bilaterally, some bruising over both knees without but no swelling, and full range of motion in both knees. (*Id.*) Dr. Losch's assessment included knee joint pain, and she prescribed pain medicine and ordered x-rays. (*Id.*)

An x-ray taken of Plaintiff's left knee on November 11, 2010, showed no bony abnormality, no joint space narrowing, and no abnormal calcification. (R. at 522.) Plaintiff was seen by Dr. Losch the same day, and Plaintiff reported that her patella had popped out of place several days prior. On exam, the knee did not appear to be out of place, but Dr. Losch found clicking with flexion and extension. She assessed Plaintiff with knee joint pain and arthritis. (R. at 525-26.)

On November 30, 2010, Plaintiff was seen for a physical therapy evaluation due to diagnoses of lumbar strain, cervical strain and knee strain. (R. at 545.) Plaintiff complained of lower back pain, neck pain, bilateral shoulder pain, bilateral knee pain with a gradual onset now affecting her mobility. (R. at 548.) Plaintiff reported that she cannot stand or walk more than 30 minutes. (*Id.*) On examination, Plaintiff's gross and fine motor skills were intact along with proprioception and light touch. (*Id.*) Her range of motion was within functional limits and manual muscle testing was 4/5 throughout with ositive laxity left patella. (R. at 549.) Plaintiff only attended this initial evaluation for physical therapy, and the record shows she cancelled or failed to appear on other occasions. (R. at 546-47.)

Plaintiff underwent an MRI of her left knee on January 17, 2011 which revealed bone infarct in the distal femur and proximal tibia and very small joint effusion. (R. at 637.)

When seen on February 8, 2011, Plaintiff complained of anxiety, depression, joint pain, chest congestion, chest tightness, and productive cough. (R. at 636.) She was assessed with knee joint pain, hyperlipidemia, aseptic necrosis of the medial femoral condyle, and aseptic necrosis of the lateral femoral condyle. Dr. Losch referred Plaintiff to the Holzer orthopedic department and ordered a bone scan. (R. at 638.)

On February 9, 2011, Plaintiff saw Neesha Smith, C.N.P. Plaintiff complained of pain and difficulty with climbing stairs, squatting, and getting up from a seated position. On examination, Ms. Smith found moderate medial joint line tenderness and mild lateral joint line tenderness. (R. at 641.) She applied a knee immobilizer and assessed aseptic necrosis of the medial femoral condyle and aseptic necrosis of the tibial plateau. (R. at 642.)

Plaintiff underwent a bone scan on February 16, 2011, which revealed abnormal activity in the proximal left tibia, which was suspect for neoplastic process. (R. at 634-35.)

Plaintiff saw Wayne Amendt, M.D., on February 24, 2011, for recheck of her knee immobilizer and to discuss the bone scan. (R. at 647.) In reviewing the MRI, Dr. Amendt found "knee joint looks normal; just a little bit what appears to be diffuse hemorrhage in the anterior proximal lib; the report states she has inchondroma bone infart distal femur but I don't believe this is what it is." (R. at 648.) On examination, Dr. Amendt found moderate medial joint line tenderness and moderate lateral joint line tenderness. (R. at 649.) He ordered labs, and Plaintiff returned the following day, at which time Dr. Amendt injected her knee with Lidocaine. (R. at 651-53.) He assessed joint pain, limb pain, and neoplasm of the bone. (R. at 654.)

Plaintiff consulted with hematologist, Sushil Jain, M.D., on April 11, 2011, to see "if she has any systemic illness to explain the bone infarct." (R. at 667.) On examination, Dr. Jain found tenderness in the left knee, right anxillary lymph nodal enlargement and tenderness, abdominal tenderness, and enlargement of the spleen. (R. at 669.) Dr. Jain assessed lymphadenopathy, aseptic necrosis of the medial femoral condyle, aseptic necrosis of the lateral femoral condyle, and aseptic necrosis of the tibial plateau. (R. at 670-71.) Following lab work, Plaintiff followed-up with Dr. Jain on May 2, 2011. Dr. Jain assessed aseptic necrosis of the medial femoral condyle, aseptic necrosis of the tibial plateau, distal femur and proximal tibia bone infarct of the left knee, smoker, abdominal tenderness, and splenic enlargement. Dr. Jain recommended that plaintiff continue follow-up with Dr. Chang and Dr. Losch. (R. at 674-76.)

When presenting to Dr. Losch on May 4, 2011, Plaintiff reported that she is confused because she feels like she is getting conflicting reports from all the doctors she is seeing

regarding the bone infarct diagnosis. (R. at 679.) Dr. Losch concluded, "As for the infarct of the bone, we will go ahead and get her setup with an orthopedist in Columbus for second opinion, evaluation, and suggestions of the treatment." (R. at 681.)

On June 8, 2011, Plaintiff saw Dr. Losch for continuing pain in her leg. Plaintiff reported that it felt like it was going to break and gave way so badly that she almost fell. (R. at 686.) An x-ray taken of Plaintiff's left femur on June 23, 2011 showed no fracture or destructive lesion and normal articulation at the hip and knee. (R. at 683.) In August 2011, Dr. Losch prescribed crutches. (R. at 689.)

Plaintiff was evaluated by Glen Imlay, M.D., a pain management and rehabilitation specialist, on September 6, 2011, due to numbness and tingling in her left lower extremities. (R. at 691-92.) The EMG was negative for radiculopathy or other neurological process. (R. at 693-96.) Dr. Imlay assessed limb pain, tingling, and lumbago. (R. at 698.)

Plaintiff continued to treat with Dr. Losch through the date of the hearing. (R. at 739.) Dr. Losch assessed her with xanthelasma of the eyelid, eczema, and aseptic necrosis of the lateral femoral condyle. (R. at 734, 741, 768, 790, 795, 802.)

On February 17, 2012, Dr. Losch reported that Plaintiff suffers from aseptic necrosis of the femur; and, therefore, unable to work for 6 months, through August 31, 2012. (R. at 705.) Plaintiff underwent a bone scan on October 8, 2012, which revealed degenerative changes involving both knees without evidence of occult fracture or osteomyelitis. (R. at 770.)

In May 2014, Plaintiff requested a new referral to pain management. (R. at 844.) She denied any radicular pain or weakness in her extremities. (R. at 846.) On examination, Plaintiff

8

exhibited 5/5 strength, a full range of motion in the neck, tenderness along the cervical muscles, and glenohumeral joints, but no weakness in the shoulders. (*Id.*) Plaintiff also requested MRIs, but Dr. Losch found no indication of the need for anything more than x-rays. (R. at 847.) Cervical x-rays showed stable multilevel degenerative changes, lumbar studies showed mild multilevel degenerative changes, shoulder films revealed mild AC joint arthrosis, and thoracic studies were normal. (R. at 833-37.) A follow-up MRI of Plaintiff's cervical spine taken in June 2014 confirmed C3-4 and CS-6 disc herniations with straightening of the normal cervical lordosis, a herniation at T9-10, and a bulging disc at L4-5. (R. at 825-26.).

In July 2014, Dr. Losch offered a note limiting Plaintiff to lifting 5 pounds and no standing and/or walking for more than 10 minutes at a time. (R. at 832.)

**B.     Felix Cheung, M.D.**

Plaintiff consulted with Dr. Cheung, an orthopedic oncology specialist on referral from Dr. Amendt due to concerns about malignancy for this left knee only on March 3, 2011. Plaintiff complained of whole-body pain, but specifically left knee pain, for the past two months. She stated she fell on it and developed a bone infarction. She described her pain as sharp, numb, tingling, and rated her pain severity at a level of 10 on a 0-10 visual analog scale. According to Plaintiff, it is worse during the day but wakes her up at night. Weight-bearing makes things worse. She reports trying ice and heat, physical therapy, changing behavior, as well as a steroid injection, which only worked for about a week. She continues to smoke about a pack of cigarettes per day and has ever since age 15. She has a family history of breast and lung cancer and a personal history of cervical cancer. (R. at 579-80.)

Plaintiff underwent an MRI of her left tibia and fibula on March 30, 2011, which
revealed a grade two contusion and an area of bone marrow edema with enhancement and a
pattern suggesting a stress fracture. (R. at 596-97.)

Plaintiff returned to Dr. Cheung on April 4, 2011, and he opined that Plaintiff had
"benign things" going on with her left leg, a bony infract in the femur, and a stress fracture in her
left tibia. He referred her to a hematologist for evaluation of any blood dyscrasias. (R. at 577.)

C.      The Ohio State University Medical Center

Plaintiff was evaluated by orthopaedist, Thomas Scharschmidt, M.D. on July 11, 2011,
for a second opinion as to her left leg bone infarct. (R. at 598-602.) Examination of her knee
showed no joint effusion. She had diffuse tenderness about the soft tissues and bone of the distal
femur and proximal tibia. (R. at 599.) Dr. Scharschmidt diagnosed leg edema, bone infarction,
left leg pain, and avascular necrosis of the bone and ordered an MRI. (R. at 600-02.) The MRI
of the left femur and tibia taken on July 19, 2011 showed multiple lesions within the femurs
bilaterally and multiple lesions within the tibia bilaterally. (R. at 603-04.) An MRI of the
lumbar spine taken on August 10, 2011, showed the spine showed degenerative changes at L4-5
and L5-Sl, without evidence of neurological compromise. (R. at 621-22.)

Plaintiff saw Jonathan Blau, M.D., on August 12, 2011. (R. at 625.) Dr. Blau found
tenderness to palpation in the leg proximal and distal to the knee and on compression of the
patellafemoral joint; medial and lateral joint line tenderness; palpation of the greater sciatic notch
that created burning and shooting sensation down the leg; decreased sensation along the
saphenous, superficial, and deep peroneal nerve distributions; mild foot drop when walking on
heels; difficulty walking on toes; and, numbness down the arm. (R. at 626.) Dr. Blau concluded

that, given her left lower extremity numbness and burning and a lumbosacral MRI negative for nerve root compression, the most likely diagnosis is radiculopathy. (*Id.*)  He ordered Plaintiff to neurology.

## D.      Robert Masone, M.D.

On November 30, 2011, Plaintiff saw Robert Masone, M.D., with chief complaints of cervical pain, thoracic pain, lumbar strain, left lower extremity pain, and numbness in her left lower extremity including all of her toes.  (R. at 712.) The physical examination revealed antalgic gait, Lasegue's test negative bilaterally, mild trouble transitioning from sitting to standing (causing pain), hyperextension which caused pain, tenderness over the lumbar region, and no weigh bearing on the left lower extremity.  (R. at 713.) The impression was lumbar spondylosis and sacroiliitis.  (*Id.*)

## E.      State Agency Evaluation

On November 15, 2011, state agency physician, Paul Morton, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 133-142.)  Dr. Morton opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at 141.) Dr. Morton also found that Plaintiff had postural limitations to frequently kneel, crouch, or crawl; and, to never climb ladders, ropes, or scaffolds.  (*Id.*)  According to Dr. Morton, Plaintiff should avoid all exposure to unprotected heights.  (R. at 142.)

## IV.  THE ADMINISTRATIVE DECISION

On September 8, 2014, the ALJ issued his decision.  (R. at 11-24.)  Plaintiff met the insured status requirements through December 31, 2015.  At step one of the sequential evaluation

process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since July

7, 2010, the alleged onset date. (R. at 13.) The ALJ found that Plaintiff had the severe physical

impairments of avascular necrosis of the left leg, multiple joint arthritis, degenerative disc

disease of the cervical, thoracic, and lumbar spine, mild AC joint arthritis bilaterally,

degenerative joint disease of the bilateral knees. (R. at 14.) The ALJ determined that Plaintiff's

alcohol dependence in complete remission, history of tobacco abuse, and diverticulosis were

non-severe impairments. He further found that Plaintiff's fibromyalgia is a nonmedically

determinable impairment. (R. at 14.)

At step three, the ALJ found that none of Plaintiff's treating or examining physicians

indicated impairments as severe as the criteria for any listed impairment. (R. at 15.) The ALJ

indicated that he, nevertheless, considered Listing 1.02 (Dysfunction of a joint) and 1.04

(Disorder of the spine). (*Id*.) According to the ALJ the record failed to document any criteria

required by the listings. (*Id*.) "Specifically, the record fails to document any compromise of a

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the
   criteria of an impairment set forth in the Commissioner's Listing of Impairments,
   20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform
   his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the national
   economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

nerve root, or any gait abnormality of the severity described in section 1.00B.2b." (*Id*.)  The ALJ

noted that, although Plaintiff's "avascular necrosis causes pain in ambulation, this relates to the

leg itself is not a joint [*sic*]." (*Id*.)  The ALJ further noted that one of Plaintiff's recent

examinations "revealed a good gait with no notable deficit or cadence abnormality." (*Id*.)  He,

therefore, found that Plaintiff did not have an impairment or combination of impairments that

met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart

P, Appendix 1.  (R. at 14-15.)

> At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:
>
> After careful consideration of the entire record, the [ALJ] finds that the
> claimant has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 404.1567(a) and 416.967(a) except that she is further limited
> to occasionally balancing, stooping, kneeling, crouching, crawling, working in or
> near moving mechanical parts, operating motor vehicles, or climbing ramps and
> stairs; never climbing ladders, ropes, or scaffolds; no more than frequent overhead
> lifting or carrying with the bilateral upper extremities; never working around
> unprotected heights; walking up to 50 feet without an ambulatory device; never
> standing or walking walk for more than 10 minutes at time; requiring 1 to 2
> minute breaks every 60 minutes when she is permitted to stand/walk around work
> station; working only in a static work setting not involving stringent time or
> production requirements; never socially interacting with the general public, no
> teamwork or tandem work, and no transactional, negotiational or supervisory
> tasks; and only occasional, superficial interaction with coworkers.

(R. at 16-17.)  In reaching this determination, the ALJ noted that the medical evidence of record

does not support the claimant's allegations of debilitating musculoskeletal symptomatology to

the degree alleged.  (R. at 18.)  The ALJ assigned "some weight" to Dr. Morton's opinion, giving

Plaintiff the benefit of the doubt, and considering the combined effect of her spinal, lower

extremity, and shoulder impairments, he found Plaintiff is further limited to a range of

sedentary work.  (R. at 21.)  The ALJ addressed Dr. Losch's treatment notes keeping Plaintiff off

work but assigned them "little" weight, noting they did not contain function-by-function

13

assessments and provide no reason for why Plaintiff could not work.  (*Id.*)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy.  (R. at 23-24.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 24.)

## VII.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir.  2007)).

## VIII.  ANALYSIS

Plaintiff argues that the ALJ committed reversible error in failing to find her disabled

under Social Security Listing 1.02, which provides in pertinent part:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by grossanatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), *resulting in inability to ambulate effectively*, as defined in 1.00B2b . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02 (emphasis added). An inability to ambulate effectively

means an "extreme limitation of the ability to walk." 20 C.F.R. pt. 404, subpt. P, app. 1, §

1.00B2b(1). Ineffective ambulation is generally defined "as having insufficient lower extremity

functioning . . . to permit independent ambulation without the use of a hand-held assistive

device(s) that limits the function of both upper extremities." *Id.* A person ambulates effectively if

they are "capable of sustaining a reasonable walking pace over a sufficient distance to be able to

carry out activities of daily living . . . [and can] travel without companion assistance to and from

a place of employment." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b(2). A claimant's

impairment must meet every required element of a Listing before the Commissioner may

conclude that he or she is disabled at step three of the sequential evaluation process. *See* 20

C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.

1986). Ultimately, the Plaintiff bears the burden of establishing that she is disabled under

Listing 1.02. *See Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009).

In the instant case, Plaintiff argues that the ALJ was wrong to find her avascular necrosis

affects her leg rather than her knee joint. (ECF No. 18 at 9.) According to Plaintiff, the record

indicates that her avascular necrosis affects the distal end of the left femur and the proximal end

of the tibia, which comprise part of the knee joint. (*Id*. at 10.) Plaintiff also argues that the ALJ

was wrong to conclude that the record does not demonstrate ineffective ambulation, and points to

several instances in the record that document ambulatory problems. (*Id*. at 10-12.) According to

Plaintiff, the ALJ's discussion of the record is fatally superficial and incomplete. (*Id*. at 12-13.

Plaintiff concludes, therefore, that the ALJ's step three finding is not supported by substantial

evidence in the record. (*Id*. at 9.)

The Court concludes that substantial evidence supports the ALJ's step-three analysis and,

specifically, his finding that Plaintiff's avascular necrosis did not meet or equal the requirements

of Listing 1.02. First, as the ALJ noted, no treating or examining physician had ever indicated

that Plaintiff had an impairment that met any of the Listings. (R. at 15.) Nevertheless, after his

own analysis of the requirements, the ALJ determined that the record fails to document any of

the criteria required under Listings 1.02 or 1.04. Substantial evidence supports this finding. For

example, the record fails to document any compromise of a nerve root or severe gait abnormality

or evidence that a major weight-bearing joint, as opposed to her leg, caused an inability to ambulate effectively.

Even if the ALJ had erred in finding that Plaintiff's avascular necrosis did not involve a joint for purposes of the Listings – a finding the Court expressly does not make – substantial evidence supports his conclusion that the impairment did not impact Plaintiff's ability to ambulate effectively.

As noted above, the regulations define ineffective ambulation "as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the function of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b(1). As Defendant notes, the record documents three instances when Plaintiff was observed using hand-held assistive devices. (ECF No. 21 at 11-12.) As Plaintiff argues, she was prescribed crutches in August 2011. (R. at 18, 689-690.) The record documents her use of two canes or crutches, however, only twice, in September and November 2011. (R. at 713, 729.) On a third occasion, the record documents Plaintiff "walking with *a* crutch" in February 2012. (R. at 731 (emphasis added).) Furthermore, as the ALJ noted, on June 2, 2014, Plaintiff's clinical examination "revealed a good gait with no notable deficit or cadence abnormality." (R. at 15, 853.) The Court is mindful that, at step three, Plaintiff bears the burden of demonstrating that she meets all of the required listing criteria. *Rabbers*, 582 F.3d at 653. The record contains only two references, both dating three years before Plaintiff's hearing date, suggesting ineffective ambulation. Where, as here, recent medical exams show the opposite, namely that Plaintiff displays a "good" gate and no other indications of ineffective ambulation, it cannot be said that Plaintiff has carried her burden of proving that she meets the Listing 1.02

criteria. (R. at 583.) The Court finds, therefore, that substantial evidence of record supports the

ALJ's conclusion that Plaintiff does not suffer from an inability to ambulate effectively as

required by Listing 1.02. *Duncan*, 801 F.2d at 855.

Finally, as to the ALJ's treatment of the record at a whole in his step three analysis, the

Court notes that the U.S. Court of Appeals for the Sixth Circuit has declined to require more than

"minimal reasoning at step three." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th

Cir. 2014). Furthermore, at step three, the regulations require only that the ALJ consider "the

medical severity of your impairment(s)," rather than the stricter "good reasons" requirement that

governs evaluation of treating source opinions. *Id*.; *see* § 404.1520(a)(4)(iii). The ALJ directly

addresses the severity issue by considering evidence of gait abnormality, nerve root compromise,

and the reports of treating and examining physicians. (R. at 15.) Additionally, at step four, the

ALJ discussed the medical records and testimony that support his severity analysis. (R. at 17-

19.) The Court finds, therefore, that the ALJ properly considered the severity of Plaintiff's

impairment at step three. *Forrest*, 591 F. App'x at 365.

## IX.  CONCLUSION

In sum, for the reasons stated above, the Court concludes that substantial evidence

supports the ALJ's decision denying benefits. Accordingly, the Court **OVERRULES** Plaintiff's

Statement of Errors and **AFFIRMS** the Commissioner's decision. The Clerk is **DIRECTED** to

enter judgment in favor of Defendant.

**IT IS SO ORDERED.**


Date: September 28, 2017                    /s/ *Elizabeth A. Preston Deavers*
                                            ELIZABETH PRESTON DEAVERS
                                            UNITED STATES MAGISTRATE JUDGE